**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 25-20061-CIV-BECERRA/TORRES

OSCAR BARBARA and ALEXDEX P1, LLC,

     *Plaintiffs*,

v.

GRAHAM RAHAL PERFORMANCE, LLC,

     *Defendant*.

_____/

**ORDER ON THE PARTIES'**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on Plaintiffs/Counter-Defendants' Motion for Partial Summary Judgment (as to Count I of Defendant's counterclaims) [D.E. 68] and Defendant/Counter-Plaintiff's Motion for Summary Judgment (as to Count III of its counterclaims and on Plaintiffs' request for declaratory judgment) [D.E. 71]. The parties timely responded ([D.E. 79], [D.E. 82]) and replied ([D.E. 80], [D.E. 85]), and the motions are now ripe for disposition.[1]

The ultimate issue framed by the parties' competing motions boils down to a matter of contract interpretation. When a purchase agreement is ambiguous as to

---

[1] On November 19, 2025, the Honorable Jacqueline Becerra referred [D.E. 71] and [D.E. 68] to the undersigned. [D.E. 95]. The motions are adjudicated here by Order for administrative reasons. But the parties have leave to seek de novo view of any aspect of this Order if warranted, under Local Rule 4, and the Court will treat the Order as a Report and Recommendation.

1

both the profit it promises and the remedy it provides for non-performance, neither party is entitled to resolve that ambiguity as a matter of law. This case, a failed and haphazardly entered transaction for two rare Mercedes-Benz automobiles, presents precisely that situation. Both parties seek summary judgment, but neither party has met the requisite standard necessary to obtain one. Thus Plaintiffs/Counter-Defendants' motion is **DENIED** and Defendant/Counter-Plaintiff's motion is **DENIED**.

## I.   *BACKGROUND*

This case arises from a purchase agreement for two rare Mercedes-Benz vehicles—the AMG Hyper Car Project One ("Project One") and an AMG Black Series GT ("Black Series")—that ultimately failed as to delivery of the Project One but succeeded as to the Black Series. That parties agree on that score, but disagree on pretty much everything else.

According to Plaintiff Barbara (whose holding company for the Project One Car, Alexdex P1, LLC, is the co-plaintiff), his status as a longtime buyer of Mercedes-Benz vehicles caused him to attain VIP status with the brand and allowed him to be in the running to purchase rare and limited-run vehicles from the brand, such as the Project One.   [D.E. 1-1 at 3].   Plaintiff Barbara, by way of Plaintiff Alexdex P1, went ahead with securing an allocation for the Project One car in 2017.   *Id.* at 4.   At the time, Plaintiff Barbara intended to keep the car.   [D.E. 72-2 at 2, 34:7–23].

2

The building process for the Project One, however, stretched on for years due to manufacturing and other delays.   [D.E. 1-1 at 4].   Mercedes eventually offered the buyers holding allocations for a project one car the ability to also purchase a limited edition "black series" of the Mercedes GT AMG.   *Id.*   Plaintiff Barbara agreed to also purchase what would become, as to this lawsuit, the Black Series.   *Id.*

But by 2020 to 2021, Plaintiff Barbara changed his mind: he was looking to sell the Project One and the Black Series—neither of which, at that point and four years in, had been manufactured or delivered.   Because both cars were such rare, special-order vehicles, the manufacturing process was highly customizable.   So, an inherent part of procuring a buyer—and one that would play out over the next few years of the transaction that would come to follow between Plaintiffs and Defendant—was working with the eventual buyer to obtain specifications for the build of the car.

Plaintiff Barbara's first overtures in finding a buyer were with an intermediate car broker who happened to know Mr. Rahal, of Defendant Graham Rahal Performance, LLC.   [D.E. 72-5]; [D.E. 71 at 3].   The record reflects some initial back-and-forth in late 2020 regarding specifications for the Black Series, which appears to be the first instance of Defendant's interest in that specific car.   [D.E. 72-5 at 2–9, 12].   This is further reflected in Defendant's initial, direct contact with Plaintiff Barbara via an early 2021 email from Mr. Scott Svarney, an agent of Defendant who worked closely with Mr. Rahal.   [D.E. 72-8 at 2].

3

The parties then, by mid-March 2021, agreed on a deal for both the Project One and the Black Series—a bargain that would prove ill-fated in the fullness of time. [D.E. 1-1 at 13–14].   For several years (through Fall 2024), communications in the record reflect a regular back-and-forth between, largely, Plaintiff Barbara and Mr. Svarney.   [D.E. 72-9].   Their discussion contains, among other communications, contract revision updates; notifications of wired payments; requests for calls; updates as to the Black Series and Project One; and renderings of requested specifications for the car.   *Id.*   The text message chain, among other evidence, also reflects that the Black Series was, during this period, successfully built and delivered to Defendant by December 2021 [D.E. 72-9 at 22, 27]. By then only the Project One remained outstanding.

Due to the highly customizable nature of the Project One, Mercedes required updates on the specifications for the build (as it had with the Black Series). Mercedes sent emails to Plaintiff Barbara urging him to provide these specifications by various deadlines. Similar messages were also delivered at meetings with some of the Mercedes AMG Project One team.   *See, e.g.*, [D.E. 72-13 at 2].   And the conversation with Mr. Svarney reflects, at least to some degree, communication regarding specifications, and Plaintiff Barbara indicating that he needs specifications from Defendant.   [D.E. 72-9 at 32, 40].   But the build specifications were never finalized, and Mercedes ultimately cancelled the allocation for Plaintiff Barbara's Project One, with a full refund of the downpayment.   [D.E. 72-15 at 2].

4

As analyzed below, the parties each place the blame for this with the other: Plaintiffs allege Defendant was told time and again the need for the specifications and never finalized; while Defendant claims Plaintiffs never conveyed the urgency or timing of finalizing the specifications and did not properly inform Defendant, as required under the contract, of any threat to the Project One allocation.

Now, after the breakdown of the Project One portion of the transaction, the parties have nearly antithetical views on various elements of the underlying purchase agreement, including as to Plaintiffs' profit and any remedies Defendant has under the circumstances. Additionally, Plaintiffs have to date retained $400,000 in profit under section 1(a) of the purchase agreement, along with the refunded downpayment of $587,000 from Mercedes.

After several demand letters from Defendant, Plaintiffs filed suit in Florida state court, seeking a declaratory judgment on the terms of the contract. Defendant removed the action to this Court and filed numerous counterclaims, two of which are before us at summary judgment, seeking rescission damages and recovery of the "stolen" downpayment.

At summary judgment, Plaintiffs are seeking resolution as a matter of law on Defendant's claim of theft under the Indiana Crime Victims Relief Act (Count I of Defendant's amended counterclaims). [D.E. 68]. Defendant is seeking the same as to Plaintiff's request for declaratory judgment and Count III of Defendant's amended counterclaims, for breach of contract. [D.E. 71].

5

## II.     APPLICABLE PRINCIPLES AND LAW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   In both moving for and opposing summary judgment, arguments "that a fact cannot be or is genuinely disputed must [be] support[ed]" by:

> [C]iting to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or[] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

However, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."   *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).   Further, "the burden is placed on the moving party to establish both the absence of a genuine material fact and that it is entitled to judgment as a matter of law."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).   All reasonable doubts must therefore be resolved in favor of the non-moving party.   *Anderson*, 477 U.S. at 255.

But to overcome a motion for summary judgment, the non-movant must nonetheless show—not based solely on the pleadings, but by citation to "materials in

the record"—that specific facts exist that demonstrate a genuine issue for trial.   *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial") (internal quotations omitted).   "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," as "the requirement is that there be no *genuine* issue of *material* fact."   *Anderson*, 477 U.S. at 247–48 (emphasis in original).   "A court need not permit a case to go to a jury[] when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'"   *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 592-94).   "Where the evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests."   *Id.*

### III.      ANALYSIS

Plaintiffs moved for partial summary judgment on Count I of Defendant's Amended Counterclaims, arguing that the Indiana Crime Victim Relief Act ("ICVRA," Ind. Code § 35-43-4-32) is inapplicable to the dispute here.   [D.E. 68 at 4]. Defendant moved for summary judgment on Count III of its Amended Counterclaims

7

(for breach of contract) and on Plaintiffs' request for a declaratory judgment regarding the requirements of the contract at-issue.   [D.E. 71 at 1].

This case, by the nature of the claims (including quasi-criminal theft allegations), includes some mudslinging about each party's respective actions and intentions relative to the contract. This is perhaps not unusual where large sums and rare items are involved, but nonetheless requires us to get past the mud and focus instead on the evidentiary record of the case, a deep dive that is necessary to properly understand what transpired between Plaintiffs and Defendant. Because the allegations are so focused on communications, or lack thereof, regarding the details of the Project One milestones, we are forced to meticulously work through the factual record of communications regarding the Black Series and Project One.

The parties' involvement with each other picks up somewhat later into the story of the Project One (and, eventually, the Black Series).   As for how the Project One came to be in Plaintiffs' possession (metaphorically, at this point): Plaintiff Barbara characterizes himself as a "long-time Mercedes-Benz customer who enjoys VIP status with Mercedes-Benz" and notes that this "VIP status affords him the privilege of receiving exclusive offers and opportunities to acquire special edition and limited production-run vehicles that are not made publicly available."   [D.E. 1-1 at 3 ¶¶ 7–8].   It was this status which allowed Plaintiff Barbara to be in the running for a Project One car back in 2017:

Dear Mr[.] Barbara,

8

> We are delighted to welcome you onto the Project ONE.   You are among an elite group of customers worldwide that share in our passion for the brand, and we are excited to have you on the team as we launch one of the most inspiring and powerful vehicles that Mercedes-AMG has ever built.
>
> . . .
>
> We would like to cordially invite you to reach a crucial milestone in this unique project together with us.   We kindly ask you to "Save the Date" for a visit to Berlin from June 10th to 12th where you will have the opportunity to sign your purchase option agreement.

[D.E. 72-1 at 2] (email from G. Chabin, Mercedes-AMG Project ONE Team, dated May 17, 2017).

The resulting "Purchase Option Agreement" with Mercedes is in the record at [D.E. 72-4 at 2–5] and includes a requirement to pay €500,000 to secure the right to purchase the Project One.   This sum was indeed paid, and Plaintiff Alexdex P1, LLC (a company created and controlled by Plaintiff Barbara [D.E. 69-7 at 21–22]) was to hold the Project One car.   [D.E. 72-2 at 4, 66:11–68:25 (also noting that Plaintiff Barbara took out an unsecured loan, part of which is still active, to pay at least some portion of the deposit)]; [D.E. 72-4 at 2 (reflecting Alexdex P1, LLC as the company on the Mercedes Purchase Option Agreement)].   Per Plaintif Barbara, he had no intention—at least initially—of selling the Project One, as it was "one-of-a-kind." [D.E. 72-2 at 2, 34:7–23].

What follows, at least in the record, is a series of text message conversations— many involving various agents of or stakeholders in Defendant.   The messages in this record begin in November 2020, roughly three years after the email at [D.E. 72-1] welcoming Plaintiff Barbara to the Project One buyer's group.   [D.E. 72-5 at 2].

9

Moreover, the messages continue on November 25, 2020, with Plaintiff Barbara messaging a "Jack JR – Ferrari Ft. Lauderd[ale]"—later identified as "car broker, Jack Bardakjian" [D.E. 71 at 3].   [D.E. 72-5 at 2].   Most of the messages are, essentially, "phone tag," but appear to indicate that Mr. Bardakjian has received some level of interest in the Black Series:

> Plaintiff Barbara, November 30, 2020: Good afternoon Jack, when you can please call me so we can further our conversation about the Mercedes.   Thank you, Oscar[.]
> . . .
> Plaintiff Barbara, December 2, 2020: Good afternoon, were you able to speak to the buyer?
>
> Mr. Bardakjian, December 2, 2020: Yes he wants to do it just waiting on him for the specs.
> . . .
> Mr. Bardakjian, December 9, 2020: Hi Oscar it Jack.   Please send a copy of the build sheet and proof of ownership to here please thx[.]
>
> Plaintiff Barbara, December 9, 2020: [Sends a PDF entitled, "Oscar Barbara VIP GTBS MSRP build 12-09-2020.pdf.]
> . . .
> Mr. Bardakjian, December 9, 2020: Can your guy switch his black series to the silver project one scheme with black and orange interior?   He's asking[.]
>
> Plaintiff Barbara, December 9, 2020: We had that option yesterday but I will call right now[.]   Please call me[.]

[D.E. 72-5 at 2–9].   The first inkling that Mr. Bardakjian's client on the other end is, perhaps, Defendant is in a message from December 11, 2020, which appears to be from Mr. Rahal to Mr. Bardakjian, that was then forwarded to Plaintiff Barbara:

> Jack,

> I need a contract in place that Oscar guarantees the car.   I need to make sure that we are guaranteed the delivery of the car, and that our deposits and money is going to MB.   We need to protect ourself so if Oscar somehow went bankrupt or something else that he will refund us in full or something else.
>
> Is Oscar ok with that?
>
> GR

[D.E. 72-5 at 12].   From later on December 11, 2020, to December 16, 2020, is a series of messages from only Plaintiff Barbara asking that Mr. Bardakjian call him and whether he was able to "get with Graham." *Id.* at 13–14.[2]   Also included is a message from Plaintiff Barbara from December 12, 2020, which reads: "Good afternoon, please remember to take a look at the contract and give me a call.   Thank you[.]" *Id.* at 13.   The stretch of unanswered messages finally ends on December 16, 2020, after Plaintiff Barbara sends the following:

> Jack I [*sic*] assuming these guys are out.   Do you have anyone else?
>
> Call me when done.
>
> Thanks[.]

[D.E. 72-5 at 14].

---

[2] For his part, Mr. Rahal's declaration states that Mr. Bardakjian "informed [him] that Oscar Barbara[] wanted to sell" the Project One and Black Series in "early 2021." [D.E. 72-6 at 2 ¶ 4].   The timelines for the texts are close—December 2020 versus "early 2021," but given Mr. Bardakjian was communicating with (and relaying information from/about) an individual with the same initials as Mr. Rahal and with the same first name, it seems likely Mr. Rahal's involvement in a potential deal occurred before early 2021.

After another few "[s]tanding by" and "[p]lease call me" messages from Plaintiff Barbara through December 18, 2020, he asks Mr. Bardakjian if he "ha[s] anyone else before I can someone in CA that I sold my Enzo to." *Id.* at 15.   Mr. Bardakjian answers that he does not "have a solid deal right now." *Id.*   Plaintiff Barbara responds with: "Understood.   Thanks.   Ask around to ones you can trust[.]" *Id.* at 16.

There is, ostensibly, still some deal in the works, because the conversation goes quiet until December 24, 2020, when Plaintiff Barbara texts: "Good afternoon and Merry Xmas.   If they can close by year end I will let it do it for 375K[.]" *Id.*   But the trail of messages again goes cold until January 23, 2021, when Mr. Bardakjian reaches out to ask: "Hi Oscar.   Did you[] sell the P1 car[.]" *Id.* at 17.   Plaintiff Barbara indicates he has not and is "waiting for" Mr. Bardakjian.   *Id.*   Mr. Bardakjian then tells Plaintiff Barbara to, "[c]all me Monday I have a perfect guy for you[.]" *Id.*   There is no immediate clarification as to the identity of said "perfect guy."

And so ensues a series of back-and-forth texts through mid-February 2021, with Plaintiff Barbara asking about the progress of Mr. Bardakjian's client contact with the interested buyer for, at least, the P1—including Plaintiff Barbara's offer of "50K" if Mr. Bardakjian would indeed find him a buyer.   *Id.* at 18–22.   On February 12, 2021, Plaintiff Barbara texts:

> Good afternoon brother, I received an offer for the cars.   Do you think your guys wants to make a run for them?   I don't want to keep bothering you.

*Id.* at 22.   The next message, also from Plaintiff Barbara and from February 27, is a series of three pictures of a Black Series car with the message that he "Still has the pair[.]"   *Id.* at 23–24.

The texts break off until March 8, 2021, when Mr. Bardakjian asks Plaintiff Barbara to call him.   *Id.* at 24.   Mr. Bardakijan then, on March 11, informs Plaintiff Barbara that a sale of an unidentified car fell through: "The Doc decided to pursue the other car.   He's getting it for 250k."   *Id.* at 25.

After March 11, 2021, the message chain with Mr. Bardakjian turns into a series of one-sided texts to Plaintiff Barbara, including, on September 14, 2021, "Hi Oscar how are you[?]   [Do y]ou still have your project ones cars[?]"   *Id.* at 27.

Based on other evidence in the record, it appears that the "offer for the cars" to which Plaintiff Barbara referred in his February 12, 2021, text to Mr. Bardakjian is likely one from Defendant.   Just one day prior, February 11, 2021, Plaintiff Barbara was contacted via email by Scott Svarney, who ran the sales department at Graham Rahal Performance (i.e., Defendant):

> Hello Oscar,
>
> I hope all is well.
>
> My name is Scott Svarney with Graham Rahal Performance.   I run [the] sales department for Graham here at GRP.   We specialize in sourcing limited production vehicles for our clients and was hoping that you might have a vehicle available that I am looking to acquire.   We

currently have a client on the hunt for the new Mercedes black series that should start hitting the ground shortly but he is looking for one in the Project One design.

If you do happen to have one coming and would be open to selling it quietly off market, please let me know.   Also if you have anything else you are looking to buy or sell currently, please let me know on that s well.   We would definitely love the opportunity to develop a relationship with you and show you what GRP is all about.

Thanks for your time and I hope to talk to you soon.

[D.E. 72-8 at 2].   This was, apparently, of mutual interest, because a text chain between Plaintiff Barbara and Mr. Svarney developed that same day, with Plaintiff Barbara send over images of the "current build sheet."   [D.E. 72-9 at 2].   This is the first true indication in the record evidence that shows interest from Defendant (by way of Mr. Svarney) in *both* the Project One *and* the Black Series:

Ok we would be at 300k premium for the pair.   We would do paperwork and give you the total premium now plus any deposit money that has been put down already.   We would pay the next deposit to you right away when it is requested by Mercedes.   Obviously everything will be kept completely quiet and off market.

Also just a FYI Graham just got his update last week on the project one. For the USA there will be a lottery for allocations on who gets which car first and that won't happen till Q1 2022 so it's getting pushed back again.

*Id.* at 3.

It merits highlighting here that this is also the first time the record evidence reflects that Mr. Rahal was, himself, also in the running for a Project One hypercar. It is not initially clear from the statement that "Graham just got his update last week on the project one," as this could have been any update from a myriad of sources (e.g.,

14

news from a connected friend or Plaintiff Barbara).   However, the ensuing text chain

with Mr. Svarney clarifies this fact:

> Mr. Svarney, March 2, 2021: Hey Oscar.   Graham got his number today for the Project One.   Did you happen to get yours?
>
> Plaintiff Barbara, March 2, 2021: What number they he get?   I was not able to be on the call[.]
>
> Mr. Svarney, March 2, 2021: It was his limitation number.
>
> Plaintiff Barbara, March 2, 2021: Not sure what that means?
>
> Mr. Svarney, March 2, 2021: What number his car is out of how many are being made.   For example 115/275[.]   When you find out let me know bc that will give an idea of when your car will be delivered[.]   Any idea on delivery date for the black series yet?
>
> Plaintiff Barbara, March 2, 2021: I just checked. I did good. Considering there's 275 cars for the world and only 55 coming to USA my number 104 must mean that I'm one of the first ones for the US[.]
>
> Mr. Svarney, March 2, 2021: Yes you did great.   Better than Graham[.]
>
> Plaintiff Barbara, March 2, 2021: Yes I did [racing flag emoji][.]

*Id.* at 7–8 (going on to note that the Black Series will be delivered in May).   Hence,

Mr. Rahal had *his own* allocation for a Project One car.[3]

---

[3] See also [D.E. 69-1 at 56, 222:14–20 ("Q. Well, didn't Graham have a P1 allocation? A. Yeah. Q. And didn't he receive an Option Agreement? A. I believe he did, yeah. Q. And wouldn't – would he have read and reviewed that Option Agreement? A. Yeah, but that's not what I'm talking about."), 240:2–17 ("Q. And as someone who had received an allocation from Mercedes, right – A. But let me just finish something.   Q. No, sir, sir – okay. . . . Q. As someone who has received an allocation from Mercedes, you or GRP would know that you need to timely provide specifications, otherwise there is a risk that you could lose the car, right? . . . [A.] We didn't know that.   We – Graham didn't – he turned in his allocation.   He never got anything saying, if you don't give us specifications by this date, you're going to lose the deal.")].

15

Putting that aside for a moment, the text chain between Plaintiff Barbara and Mr. Svarney then progresses into a back-and-forth regarding the terms and payment of (and requests for calls about or communications regarding) the deal that we now know would later be consummated on March 11, 2021.   [D.E. 1-1 at 13–14]; [D.E. 69-8 at 1] (March 10 email from Mr. Svarney to Plaintiff Barbara attaching a draft contract, "GRP.Barbara AMG Agreement.pdf"); [D.E. 69-9 at 1] (March 11 email from Mr. Svarney to Plaintiff Barbara enclosing an updated draft purchase agreement); [D.E. 69-11 at 1] (email between Mr. Svarney and Mr. Rahal detailing changes requested by Plaintiff Barbara).

The ensuing, final purchase agreement [D.E. 1-1 at 13–14] is largely typed, but modified four times by hand, with each change initialed by both Plaintiff Barbara (ostensibly also on behalf of Plaintiff Alexdex P1, the separate signature line for which bears Mr. Barbara's signature, as well) and Graham Rahal (on behalf of Defendant as its duly authorized representative).   *Id.*

The contract requires "$400,000 upon execution of this Agreement," with that amount "represent[ing] the total Buyer owes Sellers over the MSRP for each of the Vehicles."   *Id.* at 13.   Then, the contract requires "$587,000 within 30 days of executing th[e] Agreement," which "reimburses Sellers for their initial deposit."   *Id.* The section closes, as amended and initialed, with the following:

> These amounts represents [*sic*] the total remaining balance for the Project One [and/or the GTBS Black Series] determined by Mercedes. As soon as Sellers become aware of the amount in 1(c) above, they shall provide proof of such amount to Buyer and write-in such amount in 1(c).

16

> Buyer shall pay Sellers such amount within 48 hours of Sellers notifying Buyer of such amount.

*Id.* The purchase agreement further contains "notifications," "buyer's remedies," "confidentiality," and "dispute" provisions:

> Sellers shall update Buyer about the production status of the Vehicles and their anticipated delivery dates. If any circumstances arise that may delay or altogether prevent either of the Vehicles from being delivered, Sellers shall immediately notify Buyer by sending an email to [Mr. Rahal's email] and calling Graham Rahal at [his phone number].
> . . .
> If Sellers are unable to perform their contractual obligations under this Agreement because of any act or omission of a third-party, including Mercedes, then Buyer shall have no recourse against Sellers other than Seller immediately refunding all payments to Buyer. If, however, Sellers fail or refuse to complete all terms and conditions of this Agreement due to their own acts or omissions, Buyer may elect either of the following remedies: (a) file an action against Seller for all appropriate relief, including specific performance, or (b) an immediate refund [of] all Payments, plus four percent (4%) interest on the Payments, which Buyer actually made to Sellers, retroactive to the date of the first payment.
> . . .
> The parties shall keep the terms, conditions, and existence of this Agreement strictly confidential. The parties acknowledge that this provision is a material term of the Agreement and, in the event one of the parties breaches this provision, the nonbreaching party shall be entitled to seek all appropriate relief.
> . . .
> In the event a dispute arises between the parties, Indiana law [will] govern such [a] dispute and the interpretation of this Agreement, without regard to the choice of law principles. Any action arising out of or related to this Agreement shall be filed in the state or federal courts located in [Miami, Florida]. If such an action is filed by the Buyer, it shall be entitled to recover all expenses, including attorneys' fees.

*Id.* at 13–14 (with initialed change of court venue from Marion County, Indiana to Miami, Florida).

17

In the days following the signing of the contract and initial payments of $400,000 on March 12, 2021, and $587,000 on March 24, 2021 [D.E. 72 at 5 ¶¶ 37–38][4], the relationship between Mr. Svarney and Plaintiff Barbara is quite cordial. [D.E. 72-9 at 16–17]. Mr. Svarney, on March 25, even asks if Plaintiff Barbara knows of anyone else selling another Project One. *Id.* Mr. Svarney and Plaintiff Barbara then continued to have fairly frequent communication in the following months and years, with a message chain that largely consists of check-ins about the Black Series, contract milestones, and the yet-to-be-built Project One. In short, this text chain tracks the milestones of the parties' business relationship, including its eventual breakdown:

> Mr. Svarney, May 7, 2021: Hey Oscar. Hope all is well. Just wanted to check if you had any update on the black series and when it might arrive.
>
> Plaintiff Barbara, May 7, 2021: Hi Scott, hope you're well too. I have not heard anything[.]
>
> Mr. Svarney, May 7, 2021: Ok. Are you able to ask your dealer if they have an update. I know some are getting ready to ship if they have not already. Just want to make sure we have everything ready on our end when it arrives.
>
> Plaintiff Barbara, May 7, 2021: I'll reach out to the GM right now.
> . . .
> Mr. Svarney, May 26, 2021: Hey Oscar. Just wanted to touch base on a couple things. First I wanted to see if you received the model for the Project One and if so if you could send that out to us. Second wanted to touch base if you heard anything more on the black series coming next month.

---

[4] Plaintiffs' response to Defendant's statements of fact as to these payments disputes the paragraphs indicating payment, but not as to the amounts or the dates. [D.E. 83 at 3 ¶¶ 37–39]. Plaintiffs' dispute centers around Plaintiffs' view that they were due a $400,000 premium on *each* car and that the remainder of the payment sections of the contract are ambiguous. *Id.*; [D.E. 1-1 at 10].

18

Mr. Svarney, July 12, 2021: Hey Oscar.   Hope you are doing well.   I just got word that some of the black series have been released from port so wanted to touch base with you to see if your vehicle was one of them.
Plaintiff Barbara, July 12, 2021: Hi Scott, I have not been notified.

. . .

Plaintiff Barbara, December 14, 2021: [Sends 6 photos of the Black Series.]

Mr. Svarney, December 14, 2021: Looks great.   If you have a copy of the total as well so I can get accounting ready to send the money that would be awesome.

Plaintiff Barbara, December 14, 2021: [Sends window sticker and a printout from Mercedes-Benz of Coral Gables.]

Mr. Svarney, December 16, 2021: Hey Oscar.   Wire has been sent.   Please let me know once you receive it.   Also please let me know the pick up address so I can get transport going for it.[5]

. . .

Mr. Svarney, April 19, 2022: Hey Oscar.   Hope all is well.   Just wanted to touch base and see if you received the title for the black series and if you could have that sent to us.

Mr. Svarney, June 10, 2022: Hey Oscar.   I hope all is well.   I need you to get that title for the black series sent up as soon as you can.   I'll send you the address in the next message on where to send it.   Thank you.

Plaintiff Barbara, June 10, 2022: [Thumbs up emoji.]

. . .

Mr. Svarney, November 6, 2023: Hey.   Hope all is well.   Just touching base to see when the spec is due in and if you knew when the next deposit would be due to Mercedes.

. . .

Plaintiff Barbara, November 9, 2023: Can I call you later?

Mr. Svarney, November 9, 2023: Two questions I'm being asked on PJ1.   [(1) H]ave the[y] told you what msrp is for it[ and] can you take some screenshots

_____

[5] On this date, Defendant wired Plaintiff Barbara $408,895.23 for the Black Series. [D.E. 72 at 5 ¶ 39].   *See supra* n.4 re Plaintiffs' objections as to this statement of fact. Nonetheless, the parties view the Black Series car as having been "successfully delivered."   *Id.* ¶ 40; [D.E. 83 at 4 ¶ 40].

of the options from the portal.   I guess Graham doesn't have his anymore so would need a way into the option list.

. . .

Mr. Svarney, November 14, 2023: Hey Oscar.   Can you see if you can get a rendering of the car in Viola Parsifae with silver AMG stars.

. . .

Plaintiff Barbara, December 6, 2023: [Sends picture of a Lamborghini in "Viola Pasifae" from "exoticcarcolors.com."]   Please confirm this is the color.

Mr. Svarney, December 6, 2023: Yes but would like to see a rendering of that color with the silver AMG stars before we confirm it for the spec.   Graham said they should be able to make a rendering for you[.]

Plaintiff Barbara, December 6, 2023: I made the request but they were confused.   I have to sent [*sic*] them the picture as well[.]

Mr. Svarney, December 6, 2023: Got it.   Just looking for that but with the stars in the back.   So like the amg f1 scheme but base layer purple[.]
Plaintiff Barbara, December 7, 2023: GM, they can do the color but not with the stars[.]

Mr. Svarney, December 7, 2023: Ok.   This is what I got back to try then: Can you ask them to render the color maybe with the carbon rear fin, and amg logo in the purple to match?

Mr. Svarney, December 13, 2023: Hey Oscar.   Seeing if you have any update on the second request[.]

Plaintiff Barbara, December 15, 2023: Call me[.]

Mr. Svarney, December 19, 2023: Hey Oscar.   Let me know if you are available and I'll call you now[.]

Mr. Svarney, December 20, 2023: Car purple color that I gave you[, w]ing carbon[,] AMG letters on rear shark like fin in the same purple color as car[.]

Plaintiff Barbara, December 20, 2023: [Thumbs up emoji.]

. . .

Mr. Svarney, December 27, 2023: Hey Oscar.   Hope you and the family had a nice Christmas.   Just wanted to follow up and see if you got anything back yet on the rendering.

Plaintiff Barbara, December 27, 2023: Hi Scott, hope you had a great Christmas as well!   No, I have not.   They are closed for the holidays so I'm sure we won't see anything until next year.

Plaintiff Barbara, January 10, 2024: [Sends requested spec image of Project One, as rendered.]

Mr. Svarney, January 30, 2024: Should know on spec shortly.   Did they give you anything saying they are doing show and display now.   Rumor out there that they might not be able to come into USA.
. . .
Mr. Svarney, February 29, 2024: Hey Oscar.   Just confirming with you that you would be alright with someone overseas getting the allocation since the cars have to stay there anyways.

Plaintiff Barbara, March 26, 2024: Please all [*sic*] me.

Mr. Svarney, April 11, 2024: Hey Oscar.   Do you have the payment schedule for the project one?   I'm assuming they still need spec asap[.]
. . .
Mr. Svarney, April 18, 2024: Hey Oscar.   Just wanted to touch base again on the payment schedule.   I'm pretty sure the rest is due when production is finished but wanted to confirm with you[.]

Mr. Svarney, June 13, 2024: Hey Oscar.   Let me know if you are available for a call today with Graham and I.   I know you wanted to speak with us on everything in regards to the Project One.

Plaintiff Barbara, June 13, 2024: GM, we can do it tomorrow[.]

Mr. Svarney, June 13, 2024: Let me see if he is free tomorrow.   I think he's testing [f]or INDYCAR[.]   Yea he said he's testing all day tomorrow and goes straight to a flight.   It can be later in the day today if you would like.

Plaintiff Barbara, June 13, 2024: I've got a hell of a day, but let's try for 4 PM[.]
. . .
Plaintiff Barbara, June 19, 2024: Please call me[.]

Plaintiff Barbara, July 11, 2024: Good afternoon, these people are upset with not giving final direction[.]

Plaintiff Barbara, August 6, 2024: Call me[.]

21

Plaintiff Barbara, September 19, 2024: Scott, for months I've been waiting for direction and nothing.   I need to speak with you urgently.

Plaintiff Barbara, September 21, 2024: Scott, they took my car away from me!

[D.E. 72-9 at 17–40].

Mr. Svarney, for his part, has stated in his sworn declaration that he was never informed "that Mercedes had set a deadline to provide specifications for the Project One or that Mercedes would cancel Plaintiffs' option to purchase the Project One if the deadline were not met."   [D.E. 72-10 at 3 ¶ 8].   He also states that he "did not learn that Mercedes had set a deadline and threatened to cancel Plaintiffs' option to purchase the Project One until after Mercedes had already cancelled the option[.]"  *Id.* ¶ 9.

Nonetheless, as Plaintiff Barbara and Mr. Svarney were corresponding, the leadership for the Mercedes-AMG Project One group was also reaching out to Plaintiff Barbara.   For instance, emails from March 2024, stress the seriousness of needing the specifications for the Project One build and require a "final configuration appointment" by "05.04.2024."   [D.E. 72-12 at 2] (also noting that if they hear nothing further, they "will unfortunately have to assume that you are no longer interested in purchasing a Mercedes-AMG ONE").   In another email, dated July 16, 2024, Guillaume Chabin of Mercedes-AMG reaches out with a more dire warning:

> Since our last video conference on the 20th of June, we have been asking every week for your final decision regarding your interest in the acquisition of the Mercedes-AMG ONE.   We unfortunately could exchange on this and did not receive a response to date[].

22

> The last cars are currently being planned for production as announced on several occasions and your configuration cannot be postponed anymore. I therefore confirm that without a final answer from your side by the 22nd of July, we unfortunately will have to terminate our purchase option agreement.

[D.E. 72-13 at 2].

On August 5, 2024, Mr. Chabin sent an email to Plaintiff Barbara cancelling the Purchase Option Agreement due to "not receiv[ing] any feedback from you regarding your final configuration." [D.E. 72-15 at 2]. The email also notes that the amounts already paid to Mercedes for the Project One "will be returned in full without interest." *Id.* The email also encloses a formal letter indicating the same. *Id.* at 4. Notably, the record indicates at least some lag between when Plaintiff Barbara was sent the August 5, 2024, email and when he informed Mr. Svarney that "they took [his] car away" on September 21, 2024. There is a message from July indicating that Mercedes is "upset with not giving final direction," but all later texts messages are from after August 5, 2024.

Additionally, text messages between Mr. Rahal and Plaintiff Barbara from October 2024, further detail the breakdown of the transaction—including a general lack of awareness of the situation on Mr. Rahal's behalf:

> Mr. Rahal, October 7, 2024: Hey Oscar this is Graham Rahal. Are you available tomorrow to discuss amg one?

> Plaintiff Barbara, October 8, 2024: Good morning, I am tied up the next two days. We can speak Thursday[.]

23

Mr. Rahal, October 8, 2024: Yes really just need to know we can still spec the car and I'm sure you need it asap[.]

Mr. Rahal, October 9, 2024: Hello sir.   Are you doing ok down there?

Mr. Rahal, October 11, 2024: Hey man!   Please let me know on amg one spec and timing.   Really want to close this loop[.]

Plaintiff Barbara, October 11, 2024: Sorry Graham, this week was already bad before hurricane came this way.   Unfortunately, cannot still spec the car as I told Scott weeks ago.   I never heard back from you guys and they took my car way [*sic*] from me.

Mr. Rahal, October 11, 2024: Wait, you don't have an allocation anymore?   How does that work?   I've never heard of that.

Plaintiff Barbara, October 11, 2024: Graham, how can you say that. Contract gives seven days for responses.   I've been chasing you guys since the end of last year for decisions.   Including having special color rendering done almost a year ago.   This has affected my relationship with Mercedes, which was stellar and took me decades to build and millions of dollars in purchases to establish[.]

Mr. Rahal, October 11, 2024: They cannot just take away an allocation when you have a deposit.   And the cars are just now being built[.]   I've not heard of anyone being chased for a specification.   I know clients who still have not specified.

Plaintiff Barbara, October 11, 2024: Cars have been built, mines [*sic*] was one of the first ones which I gave you the allocation sheet that they gave me and that slot came and went while I was chasing you guys yet they kept waiting patiently till they ran out of patience.   You're a dealer you know how it works.   They have to order parts from their subcontractors ti [*sic*] keep the production line going.   You cannot hold back information and expect them to wait forever.   Last time we spoke months ago I stressed the urgency and on top of that, I've been texting and calling Scott trying to follow and no reply.

Mr. Rahal, October 11, 2024: He says the same that he's been messaging without reply.   So I'll have to review his messages and we will go from there.   But this puts us at major liability with all parties[.]

24

> Plaintiff Barbara, October 11, 2024: Here's a small sample. Unfortunately, we're all unhappy at this point.
>
> Mr. Rahal, October 11, 2024: Yes but did they give you your money back then?   Because now i [*sic*] have to refund my client and handle that.   I just need that info.   Last message we have from you is June 14th or 19th.   No indication that allocation was pulled[.]   We will sort it but this isn't ideal[.]
>
> Plaintiff Barbara, October 11, 2024: [Sends screen shots of final communications with Mr. Svarney.]

[D.E. 72-16 at 2–9].   At the close of their October 11, 2024, communications, Mr. Rahal suggests they email Mercedes to try and mend the relationship.   *Id.* at 10. Then, on October 15, 2024, Mr. Rahal has the CEO of the Defendant company "give [Plaintiff Barbara] a ring," as "he has reviewed [the] contract with AMG and they cannot pull [the] allocation[.]"   *Id.* at 11.

It also merits noting that while all of the above was transpiring, there was apparently another transaction occurring—between Defendant and a third-party buyer interested in the Project One.   Exhibit 19 for the deposition of Defendant's corporate representative, CEO Charles Chejfec, contains a purchase receipt emblazoned with "Graham Rahal Performance" branding.   [D.E. 69-19 at 6]; *see also* [D.E. 72-17 at 2].   This purchase receipt shows "Purchased Vehicle 1" as a 2022 Mercedes Project One, with "type" "[a]llocation," "stock#" "[a]llocation," and VIN

"7P2Q-104."[6]   *Id.*   The purchaser is listed as "IRB Capital Holdings LLC" and the deposit is $1,200,000.00.   *Id.*

A text chain between "Scott Car Broker" (presumably Mr. Svarney) and a man identified as "Israel" (or, Israel Bernal of IRB Capital Holdings LLC, who "has been a client of GRP for a long time" and "continues to be a client") sheds some light on the third-party transaction.   *See* [D.E. 69-1 at 12, 47:11–21] (deposition of Mr. Chejfec discussing Mr. Svarney texting Mr. Bernal); [D.E. 69-17 at 1–16] (screen captures of the text chain between Mr. Svarney and Mr. Bernal), e.g.:

> Mr. Svarney, March 18, 2021: Graham just texted me he can get the project one if you want it.
>
> Mr. Bernal, March 18, 2021: Yep.
> . . .
> Mr. Svarney, March 23, 2021: Hey Israel. Wire has been received. Graham just told me []he is still waiting to hear a time frame and will let him know[.]
> . . .
> Mr. Svarney, [date unidentified, but before November 30, 2023, at 5 PM]: Not yet but hoping real soon.   I have him pushing Mercedes again for this rendering.
>
> Mr. Bernal, November 30, 2023: Do you have the rest of the service records coming yet?
> . . .
> Mr. Svarney, [date unidentified]: He hasn't received anything back still but said he would follow up on it again[.]
>
> Mr. Bernal, [date unidentified, but before January 5, 2024, at 9 AM]: K thnx[.]
> . . .

---

[6] Notably, this is the identifier for Plaintiff Barbara's allocated Project One—not Mr. Rahal's.   [D.E. 69-7 at 13]; [D.E. 60-6 at 8] (text message chain showing image of [D.E. 69-7 at 13] sent by Plaintiff Barbara to Mr. Svarney).

Mr. Bernal, January 10, 2024: Tried calling earlier any updates?

Mr. Bernal, January 11, 2024: Don't leave me hanging dawg!

Mr. Svarney, January 11, 2024: I'm not dodging you.   Washington traveling back from indy yesterday.   I'll call him now[.]

Mr. Bernal, January 19, 2024: Update??

Mr. Svarney, January 19, 2024: Nothing yet. Graham is waiting to speak with him.

Mr. Bernal, January 19, 2024: Did he send him the rendering?

Mr. Svarney, January 19, 2024: Yes he texted it to him and he loved it. Graham is just waiting to connect with him on the phone I'm told.

Mr. Bernal, January 23, 2024: Just checking in you got my juice coming yet?
. . .
Mr. Bernal, March 10, 2024: I need some info ASAP!!

Mr. Bernal, March 11, 2024: ???

Mr. Svarney, March 11, 2024: Was just getting ready to call you back but will wait till after you speak with Graham unless you want me to call now.
. . .
Mr. Bernal, March 28, 2024: What did you find out from Graham on the P1?

Mr. Bernal, March 28, 2024: ??

Mr. Svarney, March 28, 2024: Nothing changed.   He was in the racecar all day.

Mr. Bernal, March 29, 2024: We need to talk we have to figure something out we're back to where we started.   I feel like you guys are just blowing me off I'm trying to avoid the alternative.

Mr. Bernal, April 1, 2024: ??
. . .

Mr. Bernal, May 28, 2024: Call me[.]

Mr. Bernal, May 31, 2024: Call me[.]

Mr. Bernal, May 31, 2024: [Two ghost emojis.]

[D.E. 69-17 at 1–14]; [D.E. 69-19 at 7–9] (texts from Mr. Rahal to Mr. Bernal regarding the "cancel[ation]" of a deal for "1.2M").

In any event, as we now know, both these transactions ultimately imploded— the initial sale eventually resulted in this case and the third-party sale resulted in an action in Superior Court in Indiana.   Defendant states that it has since settled the Indiana action and was, "among other things, required[] to pay IRB $2,600,000.00" and was, in return, sold a vehicle from IRB in the amount of $1,400,000.   [D.E. 72 at 8 ¶ 66].   Plaintiff appears to object to these stated facts [D.E. 83 at 7 ¶ 66] but asks about these exact sums while deposing Mr. Chejfec (while reading the text of the settlement agreement) and Mr. Chejfec agrees such payments and/or exchanges did occur pursuant to the settlement agreement.   [D.E. 69-1 at 73, 291:2–292:9].

As for this case, the parties' finger-pointing over who caused the transaction to fail has led to differing interpretations of the terms of the underlying purchase agreement for the Black Series and the Project One.   For example, Plaintiffs claim section 1(a) of the contract entitles them to a premium of $400,000 *per car* over MSRP, and that follows because Defendant caused the contract to fail as to the Project One.

So Plaintiffs are owed the full $800,000 over MSRP fee for both the Black Series and the Project One, regardless.[7]   [D.E. 83 at 9 ¶ 77].

Defendant, on the other hand, argues (1) that section 1(c) of the contract was not a $400,000 premium fee per car, but per the entire transaction; and (2) that because Plaintiffs caused the transaction to fail as to the Project One, Plaintiffs must return not only the $587,000 downpayment to reserve the Project One but also the $400,000 premium fee in its totality (regardless of the fact that the Black Series was, in fact, delivered).   [D.E. 71 at 9].   It is undisputed that Plaintiffs have, to date, retained all $987,000 of the disputed payments. [D.E. 1 at 3 ¶ 15 ("In its Complaint, Plaintiffs seek, among other relief, a declaration that they are not required to refund any of $987,000 that GRP paid for it.")].

This dispute resulted in several demand letters from Defendant to Plaintiff Barbara, including a November 2, 2024, letter that threatened suit:

> Paragraph 4 of the contract provides that if you "are unable to perform" your contractual obligations "because of any act or omission of a third-party, including Mercedes," then you are required to "immediately refund" GRP's "Payments."   Please note that "Payments" includes the $587,000, as well as the additional $400,000 that the GRP paid you. Because Mercedes cancelled the allocation, you must immediately return the $987,000 that GRP paid you.
> . . .

---

[7] As a brief reminder, the contract requires two already-defined tranches of payments under sections 1(a) and (b), as well as a third, yet-to-be-determined tranche under 1(c), reserved for the actual balance (or outstanding balance) of the Black Series and the Project One, as determined by Mercedes.   [D.E. 1-1 at 13].   The Black Series was "successfully delivered" and its MSRP value was paid.   [D.E. 72 at 5 ¶¶ 39, 40]; [D.E. 83 at 4 ¶ 40]; *see supra* n.4 re Plaintiffs' objections as to this statement of fact.

> Alternatively, if you cancelled the allocation, a fact GRP will discover through a subpoena to Mercedes, then you are not only required to immediately return the $987,000 to GRP, but four percent (4%) interest on the Payments.
>
> . . .
>
> If you do not return the Payments by close of business Friday, November 8, 2024, GRP will file a lawsuit against you, personally, and Alexdex P1, LLC.   In the lawsuit, GRP will subpoena Mercedes for documents and testimony regarding the circumstances surrounding the cancellation of the allocation, including the party who cancelled the allocation.

[D.E. 42-2 at 2–3] (emphasis omitted).   The last demand letter in the record is dated November 26, 2024, and again threatens suit—this time more specifically for civil theft.   [D.E. 42-3 at 2].   Days later, on December 4, 2024, Plaintiffs filed a complaint in Florida state court seeking a declaratory judgment as to the terms of the contract. [D.E. 1-1].   The rest, as they say, is history.

So, with the record now laid bare, we turn to addressing the three claims on which the parties are requesting summary judgment: declaratory judgment and breach of contract (on behalf of Defendant), and theft under the ICVRA (on behalf of Plaintiffs).   Because the facts must be viewed in the light most favorably to the non-movant, we will address separately each party's arguments on summary judgment, beginning with Defendant.

### A. *Defendant's Requests for Summary Judgment*

### i.   *Declaratory Judgment*

Under Indiana[8] law, "[w]hen a contract is unambiguous, the intent of the parties should be determined by the language employed in the document."   *Thomas v. Thomas*, 577 N.E.2d 216, 219 (Ind. 1991).   But "Indiana[] recognizes that parol evidence can be considered if the contract is ambiguous."   *Deckard v. General Motors Corp.*, 307 F.3d 556, 565 (7th Cir. 2002) (citing *Huffman v. Monroe Cnty. Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992) (stating that "contradictory references cloud the intent of [a] document" and "[c]onsequently, parol evidence may be utilized to determine the parties' true intentions respecting [a] document's application")).   "The test for ambiguity is whether reasonable men would find the contract subject to more than one interpretation."   *Boswell v. Lyon*, 401 N.E.2d 735, 740 (Ind. Ct. App. 1980).

Plaintiffs' complaint claims such ambiguity in seeking a declaratory judgment "that the Purchase Agreement has been performed, and if not, whether Graham Rahal has qualified for a refund under the Purchase Agreement, for costs under 86 Florida Statutes, or, alternatively, under Title 34, Article 14, Chapter 1 of the Indiana

---

[8] As part of their request for declaratory judgment, Plaintiffs assert that the parties intended to submit to Florida, not Indiana law, as evidenced by the fact that they agreed to the jurisdiction of Florida courts.   [D.E. 1-1 at 7].   This is, however, contrary to the extremely plain language of the contract, which reflects initialed (and, thus, consented-to) changes as to several items, including venue—but not as to choice of law.   *Id.* at 13–14.   And for that matter, the Court's ruling as to Plaintiffs' motion to dismiss [D.E. 13] cites only to Indiana law.   [D.E. 39].   There is no ambiguity on this point—Indiana law applies.

Uniform Declaratory Judgment Act[.]"   [D.E. 1-1 at 10].   Defendant opposes relief on that count of the complaint and now moves for summary judgment on the claim.

Per Plaintiffs, there are numerous points of ambiguity in the contract, most of which relate back to section 1, regarding consideration.   Under Plaintiffs' interpretation, inconsistent (or nonexistent) language in the terms of payment creates ambiguity as to what is ultimately required for both parties to perform under the contract.   [D.E. 1-1 at 8–9].   These alleged inconsistences, then, contribute to further discord in the "Buyer's Remedies" section—namely that section 4 does not properly account for a situation where one car was delivered, but not the other (with additional implications depending on who is viewed as at-fault for the Project One transaction falling through).   *Id.* at 9.   Defendant disagrees: "[a] plain reading of the Purchase Agreement reveals that there is no ambiguity and that no key terms or conditions were omitted."   [D.E. 71 at 15].

Working linearly, we begin with 1(a), regarding Plaintiffs' profit.   Again, section 1(a) states:

> $400,000 upon execution of this Agreement.   This amount represents the total Buyer owes Sellers over the MSRP for each of the Vehicles.

[D.E. 1-1 at 13].   To Plaintiff, "[t]he phrase, 'each of the vehicles' suggests that $400,000.00 over MSRP is the amount of profit on each vehicle, however, only $400,000.00 is payable 'upon execution' of the Purchase Agreement."   *Id.* at 8 ¶ 58. To Defendant, however, Plaintiffs' alleged breach means that *all* $400,000 under 1(a) need be returned, along with the other $587,000 from section 1(b)—i.e., that Plaintiff

32

receive no profit whatsoever under section 1(a) for either car, even if the Black Series was "successfully delivered."   [D.E. 72 at 5 ¶¶ 39, 40]; [D.E. 83 at 4 ¶ 40].

We note before proceeding further that the contract has, indisputably, been partially performed as to the Black Series.   The contract clearly states that "Buyer wishes to acquire a new Mercedes AMG hyper car ([']Project One') and a 2021 Mercedes GTBS ('Black Series')[.]"   *Id.*   Buyer (Defendant) has, indeed, "successfully" acquired said Black Series in exchange for its MSRP price. [D.E. 72 at 5 ¶¶ 39, 40]; [D.E. 83 at 4 ¶ 40].   That much is fact.   It is curious then that the parties have such antithetical interpretations as to Plaintiffs' profit under section 1(a).

That said, we do agree that section 1(a) could indeed be interpreted in multiple ways.   For example, $400,000 is clearly due "upon execution of this Agreement," but there is a contradiction between the words "[t]his amount" and "each" in the following sentence.   [D.E. 1-1 at 13].   Plaintiffs' argument, in theory, is not entirely foreclosed. There is nothing else in the remainder of the document that directly states another payment of $400,000 is due upon the completion of the transaction, but "each" is a specific word that clearly contemplates a profit associated with *each of* the Project One and the Black Series and thus augments what "[t]his amount" signifies.

More likely, the ambiguity in the language of 1(a)'s use of "[t]his amount" and "each" could leave open the possibility that the truth is somewhere in between—the $400,000 is the total, with some of the profit derived from the sale of the Black Series

and some from the Project One.   But that is not defined and we cannot make a legal determination one way or another.   The query, then, becomes the parties' intent in forming the payment provisions of the agreement.   *Huffman*, 588 N.E.2d at 1267 ("[C]ontradictory references cloud the intent of [a] document" and "[c]onsequently, parol evidence may be utilized to determine the parties' true intentions respecting [a] document's application[.]").

Additionally, this ambiguity as to profit is why Defendant's argument on this issue is perplexing.   Defendant is indeed correct that "Payments" is defined to include the $400,000 in 1(a), and that a remedy under section 4 for if Plaintiffs "fail or refuse to complete all terms and conditions of this Agreement due to their own acts or omissions" is "an immediate refund of all Payments" plus interest.   [D.E. 1-1 at 13–14].   Yet, even if at-fault, Plaintiffs did not "fail or refuse to complete *all* terms" of the contract.

Again, the fact is that one of the "Vehicles" was sold and "successfully" delivered.   Defendant attempts to soften this by claiming that the Black Series was not the true thrust of the bargain, but that is not supported by the evidence.   [D.E. 72-6 at 2–3 ¶¶ 5–6 ("When I learned this information, I instructed one of GRP's salesmen, Scott Svarney, to reach out to Barbara to see if GRP could reach a deal with Barbara for the Vehicles.   Although GRP was interested in purchasing the Black Series, the Project One was a much more valuable vehicle and was the driving force behind GRP's desire to reach a deal for the Vehicles with Barbara.")].   Even

34

putting aside the early conversations in late 2020 conveyed to Plaintiff Barbara by Mr. Bardakijan that involve a "GR"/"Graham" and a black series, Mr. Svarney's first contact with Plaintiff Barbara is very specific in stating interest in the Black Series— not the Project One: "We currently have a client on the hunt for the new Mercedes black series that should start hitting the ground shortly but he is looking for one in the Project One design."  [D.E. 72-8 at 2].  Hence, Defendant was interested in the Black Series and a Black Series it indeed bought and received from Plaintiffs.  The Project One was not the *sine qua non* of the deal from the start.

To the end of partial performance, the "Buyer's Remedies" clause in section 4 allows for recovery in the following instances:

> If Sellers are unable to perform their contractual obligations under this Agreement because of any act or omission of a third-party, including Mercedes, then Buyer shall have no recourse against Sellers other than Seller immediately refunding all Payments to Buyer.  If, however, Sellers fail or refuse to complete all terms and conditions of this Agreement due to their own acts or omissions, Buyer may elect either of the following remedies: (a) file an action against Seller for all appropriate relief, including specific performance, or (b) an immediate refund of all Payments, plus four percent (4%) interest on the Payments, which Buyer actually made to Sellers, retroactive to the date of the first payment.

[D.E. 1-1 at 14].  It cannot be that, even were Plaintiffs at-fault, they have "fail[ed] or refuse[d] to complete **_all_** terms and conditions" of the agreement.  *Id.* (emphasis added).  The ambiguity even stretches to the section regarding the Sellers' inability to perform "their contractual obligations" due to a third-party—which is specifically not defined to include *all* such obligations, but the Seller is nonetheless required to "immediately refund[] *all* Payments to Buyer."  *Id.* (emphasis added).  The contract,

35

then, deals largely in absolutes, without contemplating a scenario as this—where half the bargain has been completed.   So, the fullness of what Defendant may claw back under the remedy provision is indefinable in light of the stage of performance and relative to what is unclear about the "Buyer's Remedies" provision.

In sum, the contract is replete with ambiguity—some of which was apparently built-in by design.   Section 1(c) leaves a blank for "amounts represent[ing] the total remaining balance for the Project one [And/or the GTBS Black Series] as determined by Mercedes."   *Id.* at 13 (bracketed edition initialed by both Plaintiff Barbara and Mr. Rahal).   And the parties partially held to this provision because the payment for the MSRP of the Black Series occurred and is not otherwise in the schedule of payments in section 1.   But even if the parties were comfortable operating in the arguable ambiguity of some provisions, that does not ameliorate its effects as to others.   Section 1(a) contains "contradictory references" that "cloud the intent of the document" and thus evidence as to the parties' intent in forming the agreement is necessary to clarify what profit Plaintiffs stood to gain from, if nothing else, the Black Series transaction.   *See Huffman*, 588 N.E.2d at 1267.   And that ambiguity, in light of the sale of the Black Series, compounds in attempting to determine what exactly Defendant may recover.   "The test for ambiguity is whether reasonable men would find the contract subject to more than one interpretation."   *Boswell*, 401 N.E.2d at 740.   That is so here.

### *ii.*        *Breach of Contract*

Defendant also moves for summary judgment affirmatively on its counterclaim for breach of contract.   Per Defendant, Plaintiffs breached the purchase agreement as a matter of law in the following ways:

> (1) Plaintiffs failed to deliver to GRP the Project One; (2) Plaintiffs failed to notify GRP, by immediately sending an email and calling Graham Rahal, to inform it that Mercedes intended to cancel the Purchase Option if Plaintiffs did not provide the necessary vehicle specifications; (3) Plaintiffs failed to refund the Payments when it became clear that they would be unable to perform their contractual obligations; and (4) Plaintiffs violated the confidentiality clause by filing the Purchase Agreement in the public record rather than under seal.

[D.E. 71 at 8].   We will take each in turn.

As to point (1), Defendant claims Plaintiffs failed under the contract to deliver the Project One.   Plaintiffs' response to this argument is, essentially, that Plaintiff Barbara made repeated attempts to get in touch with Defendant to convey the need for the Project One specifications, and that Defendant's failure to provide those specifications is the but-for cause of Mercedes canceling the allocation.   [D.E. 82 at 9–12].   In looking at the record, this is quite clearly an area of disputed material fact; to find otherwise would require us to conclude that the facts so overwhelmingly indicate that Defendant played no part in the delay of getting specifications to Mercedes that a reasonable jury could not find in Plaintiffs' favor.   That we cannot do.

There is evidence that the parties were communicating as to the specifications of the Project One—largely in December 2023 and January 2024.   For instance, Mr.

Svarney requested that Plaintiff Barbara request various renderings of the Project One in purple, with myriad additions (decorative elements, carbon wing, etc.).   [D.E. 72-9 at 31–34].   Then, on January 30, 2024, Mr. Svarney texted Plaintiff Barbara that he "[s]hould know on spec shortly."   *Id.* at 35.   But there is little between January and June of 2024, except Plaintiff Barbara requesting a call and Mr. Svarney requesting a payment schedule.   *Id.* at 36–37.   Then, on June 13, 2024, Mr. Svarney states: "Let me know if you are available for a call today with Graham and I.   *I know you wanted to speak with us on everything in regards to the Project One.*"   *Id.* at 37 (emphasis added).   Plaintiff Barbara agrees to a 4PM call.   *Id.*   Then there is a progression of unanswered texts from Plaintiff Barbara from June 19, 2024, through September 19, 2024, of increasing urgency regarding the need for "final direction." *Id.* at 40 ("Scott, for months I've been waiting for direction and nothing.").   This culminates in a September 21, 2024, text from Plaintiff Barbara about Mercedes "taking [his] car away."   *Id.*

While Mr. Svarney stated in his declaration that he never received any messages, none of the messages appear undelivered.   There was such a message earlier in the chat, with a red, iMessage-type warning around it.   But these messages are to the same person, in the same chat, and show no indication of non-delivery. Mr. Svarney was quite clearly Plaintiff Barbara's chief point of contact for Defendant and had been quite regularly communicating with him, including for discussion as to specifications.   There is, then, a clear breakdown in the parties' communication.

But we cannot find that, from the record of evidence before the Court and as a matter of law, Plaintiffs were the single point of failure in delivering the Project One and, thus, breached the purchase agreement. The jury will have to make that factual finding.

And this is to say nothing of the fact that, having himself obtained an allocation for a Project One car, Mr. Rahal would have to be, at least to a point, familiar with the steps required for confirming an allocation and their importance—even if, perhaps, not the exact timeline of a specific car in the lineup. *See* [D.E. 72-9 at 7–8]; [D.E. 69-1 at 56, 222:14–20, 240:2–17]. Plus, there are texts from Mr. Bernal relative to the third-party transaction for the Project One that suggest he was unhappy with the frequency of responses (or lack thereof) from Defendant. [D.E. 69-17 at 5 ("Don't leave me hanging dawg!"), 13 ("Call me" and two ghost emojis)]. Though not directly indicative of the course of communication between Plaintiff Barbara and Defendant (and its agents), it may indicate a similar pattern of behavior and thus adds to the myriad questions of fact on this point that require determination by a jury.

Further, as to point (2), Defendant claims Plaintiff failed to notify GRP as required under section 3 of the contract, which states:

> Sellers shall update Buyer about the production status of the Vehicles and their anticipated delivery dates. If any circumstances arise that may delay or altogether prevent either of the Vehicles from being delivered, Sellers shall immediately notify Buyer by sending an email to [Mr. Rahal's email address] and calling Graham Rahal at [his phone number].

[D.E. 1-1 at 13]. First, as to whether Plaintiffs updated Defendant on the production status of the cars and any anticipated delivery dates, the record evidence indicates this was, at least to a degree, carried out. [D.E. 72-9]. Additionally, as to the point of delay, that was arguably the entire course of the parties' transaction, as the alleged purpose of allowing buyers to purchase a black series car in the first place was because the project one cars were so severely delayed. [D.E. 1-1 at 4 ¶¶ 19–20]. So, the Project One was, by necessity of the facts, consistently in a period of delay.[9] And, finally, as we have already established, the Black Series was "successfully" delivered and thus is not at-issue here. [D.E. 72 at 5 ¶¶ 39, 40]; [D.E. 83 at 4 ¶ 40]. Hence, the thrust of Defendant's argument here regards the trigger that "any circumstance[] aris[ing] that may[] altogether prevent" the Project One from being delivered requires Plaintiffs to contact Mr. Rahal in a specific manner. The fact that Plaintiffs did not do so, says Defendant, is cause for a determination of breach as a matter of law. We disagree.

Under Indiana law, the parties' course of conduct can be relevant in interpreting the terms of the bargain:

> "[A] contract establishes a relationship among the contracting parties that goes well beyond their express promises. The promise, or group of promises, or other bargain, is fleshed out by a social matrix that includes custom, trade usage, prior dealings of the parties, recognition of their social and economic roles, notions of decent behavior, basic assumptions

---

[9] Defendant's Answer claims it has no knowledge of such delays but cites this section of the complaint in its own recitation of the facts for its motion for summary judgment. [D.E. 42 at 5]; [D.E. 71 at 2–3].

shared, but unspoken by the parties, and other factors, most especially including rules of law, in the context in which they find themselves." 1 Corbin on Contracts § 1.3, Definition of the Term "Contract" (2019) (providing a "richer, more helpful" definition of the term). "Courts construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served." 11 Williston on Contracts § 31.2 (4th ed. 2019), citing *Hooks v. Samson Lone Star, Limited Partnership*, 457 S.W.3d 52 (Tex. 2015). In interpreting and enforcing contracts here, the law takes into account the parties' actions and pragmatic consequences of their agreements and actions.

*R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 944 (7th Cir. 2020) (further concluding that "[i]t is for the jury to decide under Indiana law" the extent of an actor's authority and interpretation of certain later agreements); *see also R3 Composites Corp. v. G&S Sales Corp.*, No. 1:16-CV-387-HAB, 2021 WL 1317201, at *2 (N.D. Ind. Apr. 8, 2021) ("Here, the parties' actions are front and center in this dispute and a determination cannot be made on the interpretation of the contract terms when a jury is needed to sort out precisely what the parties agreements are, how they operated under those agreements in practice, and how they interpreted those agreements. Accordingly, as the Seventh Circuit made clear, this case must proceed to trial on the disputed contract interpretations offered by the parties[ and] their respective courses of conduct[.]").

Based on the record evidence before us, the throughline of communication for this entire transaction is between Plaintiff Barbara and Mr. Svarney, on behalf of Defendant. Their text chain spans years of fairly consistent back-and-forth regarding the Black Series and the Project One, as well as various other cars. *See, e.g.*, [D.E. 72-9 at 22 (Black Series upon delivery), 30 (other car), 35 (rendering of

41

Project One), 38 (other car)].   Additionally, their communications suggest that the typical course of conduct for Plaintiff Barbara to get in touch with Mr. Rahal was to first go through Mr. Svarney.   *Id.* at 37 ("Let me know if you are available for a call today with Graham and I.   I know you wanted to speak with us on everything in regards to the Project One.").   And that Mr. Svarney would convey questions or comments from Mr. Rahal.   *Id.* at 13 ("I sent the concerns to graham and he is going to review[.] . . . I forwarded them to graham and accounting."), 31 ("Two questions I'm being asked on PJ1."), 33 ("Ok.   This is what I got back to go try then . . .").   Also, while not conclusive, the text from Mr. Rahal to Plaintiff Barbara on October 7, 2024, suggests based on the greeting that they were not in frequent communication: "Hey Oscar this is Graham Rahal.   Are you available tomorrow to discuss amg one?" [D.E. 69-18 at 1].   In other words, why would Mr. Rahal need to first identify himself by his full name in a text chain between the two of them if he and Plaintiff Barbara were in frequent communication?   And, in the text chain with Mr. Svarney, Mr. Rahal often appears out of reach by way of other obligations.   [D.E. 72-9 at 13 ("They are working on it as we speak.   Any minute now.   Hey Oscar – he has the updated contract but is in the race car for another 45min-1hr."), 37 ("Let me see if he is free tomorrow.   I think he's testing [f]or INDYCAR[.]   Yea he said he's testing all day tomorrow and goes straight to a flight.")].

The "Notifications" provision of the contract in section 3 indeed requires Sellers to "immediately notify" Mr. Rahal via specific means "[i]f any circumstances arise

that may[] altogether prevent either of the Vehicles from being delivered." [D.E. 1-1 at 13]. But the years-long record of communications between the parties suggests that this would be highly atypical of their regular course of conduct, which was communication between Plaintiff Barbara and Mr. Svarney, on behalf of Defendant—and that is relevant in determining whether Plaintiffs' actions were a breach of section 3 of the underlying contract. There are, then, issues of material fact that put this inquiry squarely within the ambit of a jury.

Next, as to point (3), Defendant claims Plaintiffs did not refund the Payments pursuant to section 4, "Buyer's Remedies," "when it became clear that they would be unable to perform their contractual obligations." As established above, there is ambiguity in the contract at least as to section 1 (payment terms) and section 4 (remedies), as well as sufficient differences of material fact as to the parties' communications, such that a reasonable jury could conclude that Plaintiffs were not the but-for cause of Mercedes cancelling Plaintiffs' allocation for the Project One. What was "clear" when and Plaintiffs' ability to perform any contractual obligations would thus be affected, and are issues subsumed by questions of material fact.

Finally, as to point (4), Defendant claims Plaintiff violated the confidentiality clause by filing the purchase agreement with the filing of their complaint. The agreement's confidentiality clause, section 5, states the following:

> The parties shall keep the terms, conditions, and existence of this Agreement strictly confidential. The parties acknowledge that this provision is a material term of the Agreement and, in the event one of

the parties breaches this provision, the nonbreaching party shall be entitled to seek all appropriate relief.

[D.E. 1-1 at 14]. Plaintiffs, for their part, argue that this is a "red herring," as Defendant "never alleged confidentiality as a breach in its Amended Counterclaim" and also "itself repeatedly filed the Purchase Agreement in the public record not under seal." [D.E. 82 at 9 n.41]. Plaintiffs' argument, however, does nothing to account for Defendant's allegations that Plaintiffs were the *first* ones to put the agreement into the public record.

In any event, this element of the claim is, too, shrouded in issues of material fact. For instance, while Defendant castigates Plaintiffs' complaint as a "[r]ush to the [c]ourthouse" [D.E. 71 at 6], that is not quite true based on the record. Plaintiffs did not file this action until December 4, 2024. [D.E. 1-1]. Before that, and presumably in line with its view of its rights under section 4 ("Buyer's Remedies") of the contract, Defendant sent at least two demand letters to Plaintiffs—one on November 2, 2024, and one on November 26, 2024—requiring a refund of the $400,000 and $587,000 paid under sections 1(a) and (b) of the agreement. [D.E. 42-2]; [D.E. 42-3]. Both letters threatened legal action, with the latter also including specific allegations of civil theft. [D.E. 42-2 at 2–3]; [D.E. 42-3 at 2]. What's more, the first letter from early November also included a paragraph indicating that "GRP will discover through a subpoena to Mercedes" if Plaintiffs "cancelled the allocation." [D.E. 42-2 at 2].

44

Plaintiffs have, since their complaint, maintained that they believe they are owed money as a profit from the transaction and, because Defendant was the but-for cause of the loss of the Project One, that Plaintiffs are still due their profit.   [D.E. 1-1 at 7–10].   When faced with two demand letters quite seriously threatening a lawsuit and with the parties' interpretations so at-odds, the decision to bring a complaint for a declaratory judgment is by no means a "[r]ush to the [c]ourthouse."

To that end, even if Plaintiffs were the first party to put the agreement into the public record, a reasonable jury could find that in Defendant (1) threatening a lawsuit to begin with; and (2) stating that such process would involve a subpoena to Mercedes, it gave Plaintiffs every reason to anticipate that Defendant would breach the confidentiality provision.   *See Wisconsin Power & Light Co. v. Century Indem. Co.*, 130 F.3d 787, 793 (7th Cir. 1997) ("The disclaimer of a contractual duty is a breach of contract even if the time specified in the contract for performing the duty has not yet arrived.") (citing *C.L. Maddox, Inc. v. Coalfield Servs., Inc.*, 51 F.3d 76, 81 (7th Cir. 1995)); *Bradley Corp. v. Lawler Mfg. Co.*, No. 119CV01240SEBDMN, 2020 WL 263612, at *2 (S.D. Ind. Jan. 17, 2020) (an anticipatory breach is one "'accompanied by a clear manifestation of intention not to perform in accordance with any other interpretation'") (citing *Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. Ct. App. 1991)).   Again, the confidentiality provision is very broad: "The parties shall keep the terms, conditions, *and existence of this Agreement* strictly confidential." [D.E. 1-1 at 14].   One would not need to attach the agreement to breach section 5,

45

they would simply need to disclose the contract's very existence.   And we fail to see how any lawsuit, whomever from, predicated upon this contract could possibly persist without acknowledging its existence.

Additionally, a reasonable jury could also find, by looking at the factual record, that Defendant may have already breached this provision in its dealings with IRB/Mr. Bernal.   Defendant's own purchase receipt makes clear that the Project One sold to Mr. Bernal, by way of IRB, was the Project One from Plaintiffs' allocation. [D.E. 72-17 at 2].   The text messages between Mr. Svarney and Mr. Bernal strongly suggest that Mr. Bernal knows the car is coming from a third-party seller to GRP. *See, e.g.*, [D.E. 69-17 at 1 (noting that Mr. Rahal had not connected with an unnamed individual that night, but "should know tomorrow on project one" and asking if Mr. Bernal wanted Mr. Svarney to "lock it in"), 6 (discussing a "rendering" that Mr. Rahal "loved" within days of when Plaintiff Barbara provided a rendering of the Project One to Mr. Svarney)].   How, then, would Mr. Bernal not know, on some level, about the "existence of [the] Agreement" between Plaintiffs and Defendant?   Hence, taken in a light most favorable to the non-movant, there are myriad issues of material fact that could cause a reasonable jury to conclude that Plaintiffs were not the breaching party as to the confidentiality clause.

Accordingly, because Defendant has failed to show that there is no genuine dispute as to any material fact as to (1) a declaratory judgment on the terms of the contract; and (2) Plaintiffs' alleged breaches of the purchase agreement for the Black

Series and the Project one, Defendant's motion for summary judgment on these issues [D.E. 71] is **DENIED**.

### B. *Plaintiffs' Request for Summary Judgment*

Plaintiffs moved for summary judgment only as to Defendant's claim of theft under the ICVRA, Count I of its Amended Counterclaims [D.E. 42].   [D.E. 68 at 1]. As to Count I, Defendant alleges that after Mercedes refunded any downpayments for the Project One and because Plaintiffs were the at-fault party for the failure of the Project One transaction, Plaintiffs "have knowingly and intentionally refused to return the [$400,000 and $587,000] Payments [made pursuant to sections 1(a) and 1(b) of the contract] to GRP as required under the Purchase Agreement['s Buyer's Remedies section]." [D.E. 42 at 18, 21].

Indiana Code Section 34-24-3-1 "allows a person who has suffered a pecuniary loss as a result of a violation of criminal conversion to bring a civil action to recover the loss.   Unlike in a criminal trial, a claimant need only prove by a preponderance of the evidence that the criminal act was committed by the defendant."   *Gilliana v. Paniaguas*, 708 N.E.2d 895, 899 (Ind. Ct. App. 1999) (citing *Midland-Guardian Co. v. United Consumers Club, Inc.*, 499 N.E.2d 792, 795 (Ind. Ct. App. 1986)).   "A criminal conviction for conversion is not a condition precedent to recovery in a civil action brought under the Indiana crime victim's relief act," but the claimant must prove "all elements of the alleged criminal act."   *Id.* (citation omitted).   Those elements are enumerated in various sections of Indiana Code Section 35-43-4:

47

> Indiana Code Section 35-43-4-3 provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor." Indiana Code Section 35-4-1-2-2 provides that "(a) A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so. (b) A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Indiana Code Section 35-43-4-1(a) provides that to "'exert control over property' means to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Finally, Indiana Code Section 35-43-4-1(b) provides, "a person's control over property of another person is 'unauthorized' if it is exerted … without the other person's consent …."

*Greco v. KMA Auto Exch., Inc.*, 765 N.E.2d 140, 147 (Ind. Ct. App. 2002).

The intentionality element "differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to cover." *Gilliana*, 708 N.E.2d at 899. "If the mens rea element exists, even a temporary deprivation of property is sufficient to succeed under the statute." *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 564 (7th Cir. 2011) (citing *Whitlock v. Brown*, 596 F.3d 406, 413 (7th Cir. 2010)).

As applied, Plaintiffs claim "[t]his case is a contractual dispute to which the ICVRA is not applicable," as "[p]arties may not invoke the ICVRA for purely contractual disputes" or "repackage breach of contract claims as criminal violations." [D.E. 68 at 4] (collecting cases). Defendant's argument aligns with the allegations in its amended counterclaims, as described above. But Defendant also casts additional aspersions as to Plaintiffs' general conduct relative to the transaction, claiming that "the facts show that since first entering into the Project One Option

48

Agreement, [Plaintiffs] have engaged in a pattern of misconduct, including multiple contractual breaches and then repeated acts and omissions to conceal their breaches through false and misleading representations." [D.E. 79 at 4]. We have discussed at length the alleged contractual breaches, but we will take the liberty here of addressing one such alleged falsity: that Plaintiffs had "entered into multiple contracts that prohibited them from selling the Project One to another individual or entity. The Option Agreement with Mercedes contained a clause that prohibited [Plaintiffs] from selling the Project One or their interest in the Project One." *Id.* at 4–5.

The Option Agreement specifically states that "[t]he purchase option may not be sold or otherwise transferred to a third party." [D.E 72-4 at 3]. So, explicitly, the *option*, or the allotment itself, cannot be transferred to a third party, not necessarily the Project One in its extant form (e.g., if a buyer decided to sell the car some time later). It makes little sense for Defendant to raise this when (1) not only did Mr. Rahal, by the necessity of having a Project One allotment, sign such a purchase agreement [D.E. 69-1 at 56, 222:14–20], but also (2) the receipt recording the third-party transaction between Defendant and IRB/Mr. Bernal for Plaintiffs' yet-to-be-built Project One specifically indicates, in two separate sections, that the sale is for an "[a]llocation." [D.E. 72-17 at 2]. It seems odd to make this point such a feature of Defendant's alleged "pattern of misconduct" by Plaintiffs when, by all rhyme and reason, Mr. Rahal (and, by extension, Defendant Graham Rahal

Performance) had every reason to know what the sale of a Project One would implicate relative to Mercedes' requirements.   But, ultimately, that does not necessarily bear on our determination here and Defendant does make additional allegations as to restrictions imposed by a loan agreement with Centennial Bank which Plaintiff Barbara entered into to obtain the funds for the initial Project One deposit.   [D.E. 79 at 5].

In any event and indisputably, the reason for this lawsuit is a failed transaction governed by the purchase agreement for the Black Series and the Project One.   But the dispute at the heart of the ICVRA claim is somewhat distinct: while based in alleged breaches of and remedies deriving from the contract, it is really Plaintiffs' continued retention of certain funds that is the driver.   In other words, Defendant's ICVRA claim is premised largely on the following allegations: (1) Plaintiffs are responsible for the failure of the Project One element of the transaction [D.E. 71 at 5]; (2) thus, pursuant to section 4, "Buyer's Remedies," Defendant is due a refund of all Payments, including any profit from section 1(a), *id.* at 4; (3) Plaintiffs were informed by way of at least two demand letters that Defendant was seeking a refund of all Payments ([D.E. 42-2]; [D.E. 42-3]); and (4) Plaintiffs nonetheless elected to retain the $400,000 from the profit provision in section 1(a) and $587,000 reimbursement from section 1(b) for Plaintiffs' initial deposit, which by that point had been refunded in full by Mercedes [D.E. 42 at 21 ¶ 42].   Hence, Plaintiffs' continuing refusal to refund the full $987,000 is "knowing or intentional"

50

"unauthorized control" of assets that belong to Defendant, which, per Defendant, rises to the level of warranting an ICVRA claim.

Plaintiffs, however, in seeking a declaratory judgment on the contract in the face of the aforementioned demand letters, have consistently maintained that (1) Defendant's lack of direction was the but-for cause of the failure of the Project One transaction [D.E. 1-1 at 8]; (2) they are, then, still due $400,000 per car in profit under section 1(a), *id.*; and, thus, (3) Plaintiffs should not have to disgorge at least the profit, *id.* at 10. In other words, to Plaintiffs, this is a purely contractual dispute borne of ambiguity in the agreement.

Accordingly, *French-Tex Cleaners, Inc. v. Cafaro Co.*, is instructive here. 893 N.E.2d 1156 (Ind. Ct. App. 2008). In *French-Tex*, the plaintiff brought claims of breach of contract and conversion (under the ICVRA), alleging that its defendant landlord "knowingly or intentionally overcharged French-Tex for its pro rata share of[ certain] real estate taxes, and that Towne's control of this overcharged amount constituted criminal conversion." 893 N.E.2d at 1166. Having prevailed on summary judgment below, defendant Towne made similar arguments on appeal as compared to Plaintiffs here: "French-Tex's claim for conversion is nothing more than a repackaged version of its breach of contract claim brought for no other purpose than to up the ante." *Id.* at 1167. The issue, Towne claimed, was a question of ambiguous terms in the contract. *Id.* And the Court of Appeals of Indiana agreed: "Towne acted in accordance with a reasonable interpretation of the ambiguous

contract. . . . Therefore, it cannot be said that Towne's knowing control over the [taxes] was unauthorized."   *Id.* at 1168 (internal citation omitted).

Here, we have already found ambiguity in the purchase agreement for the Black Series and the Project One—particularly as to section 1(a), regarding Plaintiffs' profit, and section 4, "Buyer's Remedies."   So, applying *French-Tex*, the question that follows is whether Plaintiffs' actions regarding its argued entitlement to the $987,000 amounts to "a reasonable interpretation of the ambiguous contract," such that Plaintiffs' retention of the $987,000 is not unauthorized control of those funds?   *Id.* at 1168.   And, inherent in that question, is whether this is an issue appropriate for summary judgment.

Taking a closer look at Plaintiffs' briefing, generally, they clearly argue that they are entitled to a profit of $400,000 for each vehicle under section 1(a) [D.E. 83 at 9 ¶ 77], but notably do very little to articulate any reason for retaining the $587,000 under section 1(b).   The complaint halfheartedly argues that "[s]ubsection (c)'s language also runs counter to subsection (b), which identifies $587,000.00 as the figure that equals the Option Deposit Amount in U.S. Dollars and constitutes GRP's 'reimbursement' to Plaintiffs for the 'initial deposit' that was paid to Mercedes." [D.E. 1-1 at 8 ¶ 63].   But even then, this is only to the end of arguing that it is then unclear if subsection 1(c) "appl[ies] exclusively to the P1 Car."   *Id.* at 9 ¶ 64.   And the fact that the Project One required a €500,000 deposit (roughly $587,000 in USD) is undisputed.   [D.E. 72 at 2 ¶ 9]; [D.E. 83 at 2 ¶ 9]; *see also* [D.E. 1-1 at 5 ¶ 33] ("The

52

Purchase Agreement also called for GRP to pay $587,000 to reimburse Alexdex for its 'initial deposit.'").

Even if Plaintiff's interpretation of section 1(a) was correct, that would be, at maximum, an $800,000 profit—$400,000 per car. In also retaining the $587,000 initial deposit reimbursement for the Project One, making a total of $987,000 retained, Plaintiffs have an additional $187,000 over that $800,000 claimed profit value. In addition to not having a "Buyer's Remedies" provision that contemplates performance on one car and not the other, there is also no "Seller's Remedies" provision whatsoever—let alone one that would account for, e.g., interest. [D.E. 1-1 at 14]. So, Plaintiffs' argument is inherently flawed as to why any entitlement to the full $987,000 would be reasonable under the circumstances.

To that end, courts also weigh heavily the factor of whether the holder of the property at-issue was "aware that [their] possession was unauthorized." *Smeigh*, 643 F.3d at 564. "[A] demand for return 'is not itself an element of criminal conversion.'" *Id.* (citing *Lambert v. Yellowbird, Inc.*, 496 N.E.2d 406, 409–10 (Ind. Ct. App. 1986)). But a demand at least contributes to "evidence [that can] raise a reasonable inference that [Plaintiffs] were aware that [their] possession was unauthorized." *Id.* By way of at least two demand letters, Plaintiffs were on notice of Defendant's stance that it was due a refund of the $987,000, plus interest. [D.E. 42-2]; [D.E. 42-3]. So, Plaintiffs' argument that this is a purely contractual dispute loses steam when (1) there does not appear to be a contractual basis for at least some

of the retained funds; and (2) Plaintiffs were amply informed of Defendant's claimed entitlement to the $987,000 plus interest (and, for that matter, Defendant's belief that Plaintiffs' continued retention of those funds was theft [D.E. 42-3 at 2]).   Also potentially relevant here is the fact that Plaintiff Barbara was not timely in informing Defendant, by way of Mr. Svarney, that Mercedes had cancelled the Project One allocation.   [D.E. 72-9 at 40]; [D.E. 72-15 at 2].   While he was continuing to text Mr. Svarney and those text messages conveyed, to a degree, Mercedes' irritation and urgency, there is no mention of the allocation being revoked until September.   [D.E. 72-9 at 40].

In any event, the ICVRA claim, as with the breach of contract and declaratory judgment claims, is nonetheless embroiled in issues of material fact.   For example, were a jury to determine Plaintiffs were due some profit under section 1(a) as a result of Black Series transaction, that could affect a further determination as to what, of the $987,000, may have been reasonably retained under circumstances of contractual ambiguity (as with defendant Towne in *French-Tex*).   Additionally, a jury's determination on fault for breach of contract, as well as any findings as to the parties' intentions relative to ambiguity, could also affect how the "Buyer's Remedies" section is applied (and, thus, what may be refundable in the first instance).

In other words, while we disagree with Plaintiffs that the ICVRA claim is a purely contractual dispute, the resolution of Defendant's claim is not suited for summary judgment.   A reasonable jury could indeed find that Plaintiffs' "knowing

control over [at least some portion of the $987,000] was unauthorized." *See French-Tex*, 893 N.E.2d at 1168. But in context of the ambiguity in the underlying purchase agreement and with issues of material fact clouding a determination of fault for breach of contract, the question of Plaintiffs' unauthorized retention of the $987,000 cannot be resolved as a matter of law.

### *IV. CONCLUSION*

Based on the foregoing, Plaintiffs/Counter-Defendants' motion for partial summary judgment [D.E. 68] is **DENIED** and Defendant/Counter-Plaintiff's motion for summary judgment (as to Count III of its counterclaims and on Plaintiffs' request for declaratory judgment) [D.E. 71] is also **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of March, 2026.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge